786 F.2d 1359
 54 USLW 2543
 SEATTLE MASTER BUILDERS ASSOCIATION; Homebuilders
Association of Spokane, Inc.; National Woodwork
Manufacturers' Association; Fir & Hemlock Door Association;
Shelter Development Corporation; Clair W. Daines, Inc.;
Conner Development Co.; Donald N. McDonald; Seattle Door
Co., Inc.; Homebuilders Association of Washington State, Petitioners,
v.
PACIFIC NORTHWEST ELECTRIC POWER AND CONSERVATION PLANNING
COUNCIL (Northwest Power Planning Council), Respondent,
and
United States of America, Intervenor-Respondent.
 No. 83-7585.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 9, 1985.
Decided April 10, 1986.
As Amended June 11, 1986.
 
 Michael B. King, John W. Hempelmann, Paul Sikora, Diamond & Sylvester, Seattle, Wash., for Seattle Master Builders.
 Ronald A. Zumbrun, Robin L. Rivett, Pacific Legal Foundation, Sacramento, Cal., Sam Kazman, Kevin J. Heron, Pacific Legal Foundation, Washington, D.C., for amicus curiae Pacific Legal Foundation.
 W. Hugh O'Riordan, Roy L. Eiguren, Runft, Leroy, Stecher, Coffin & O'Riordan, Chtd., Boise, Idaho, for amicus curiae Salmon River Elec. Co-op. Idaho Cty. Power & Light Unity Light & Power.
 Aaron M. Peck, Steven G. Harman, McKenna, Conner & Cuneo, Los Angeles, Cal., Frank W. Ostrander, Gen. Counsel, Janet C. Hanson, William R. Cook, Associate Counsels, Northwest Power Planning Council, Portland, Or., for Northwest Power.
 Mike Greely, Atty. Gen., Chris D. Tweeten, Asst. Atty. Gen., State of Mont., Helena, Mont., for amicus curiae State of Mont.
 Jim Jones, Atty. Gen., John J. McMahon, Chief Deputy Atty. Gen., State of Idaho, Boise, Idaho, for amicus curiae State of Idaho.
 Kenneth O. Eikenberry, Atty. Gen., Philip H. Austin, Sr. Dep. Atty. Gen., Edward H. Southon, Asst. Atty. Gen., State of Wash., Olympia, Wash., for amicus curiae State of Wash.
 Richard Geltman, Gen. Counsel, Jeffrey Genzer, Associate Counsel, Nat. Governor's Ass'n, Washington, D.C., David Frohmayer, Associate Counsel, for amicus curiae Nat. Governors' Ass'n.
 William J. Barker, Chief Asst. City Atty., Mark Bubenik, Asst. City Atty., City of Tacoma, Tacoma, Wash., for amicus curiae City of Tacoma.
 Terrence V. Sawyer, Spokane, Wash., for amicus curiae Northwest Conservation Act Coalition.
 William M. Chamberlain, Gen. Counsel, Jonathan Blees, Deputy Gen. Counsel, California State Energy Resources Conservation & Development Comm., Sacramento, Cal., for amicus curiae California State Energy Resources Conservation & Development Comm.
 Richard K. Willard, Acting Asst. Atty. Gen., Paul Blankenstein, Robert V. Zener, Attys., Dept. of Justice, Washington, D.C., Harvard P. Spigal, Gen. Counsel, James O. Luce, Asst. Gen. Counsel, Paul S. Majkut, Stephen R. Larson, Preston D. Michie, Marybeth Van Buren, Bonneville Power Admin., Portland, Or., for the U.S.
 Petition for Review of Final Action by the Northwest Power Planning council.
 Before GOODWIN, SCHROEDER and BEEZER, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 A group of home builders and other industry representatives filed an original petition in this court seeking to strike down as unconstitutional both the Pacific Northwest Electric Power and Conservation Planning Council and the Council's 1983 Northwest Conservation and Electric Power Plan.
 
 
 2
 We have jurisdiction under the Pacific Northwest Electric Power Planning and Conservation Act, Pub.L. 96-501, 94 Stat. 2697, 16 U.S.C. Sec. 839 et seq. (1982) (the Act) and we uphold both the constitutionality of the Pacific Northwest Electric Power and Conservation Planning Council, a policy-making body established by that Act, and the validity of the Council's 1983 Northwest Conservation and Electric Power Plan.
 
 
 3
 Petitioners seek relief against two entities: the first is the United States government, which has intervened on behalf of the Bonneville Power Administration (BPA), an agency of the United States Department of Energy.[1] The second is the Council itself. BPA is statutorily charged with the production, marketing and distribution of electric power in the Pacific Northwest. See Bonneville Project Act, 16 U.S.C. Sec. 832a. See generally BPA, Columbia River Power for the People: A History of Policies of the Bonneville Power Administration (1981). The Council's mandate is to prepare a conservation and electricity usage plan for the region served by the BPA and to develop a program for energy planning consistent with regional environmental and ecological concerns. Sec. 839b(a)(1). Congress has consented to the establishment of the Council, Sec. 839b(a), to be composed of members appointed by the governors of Washington, Oregon, Montana and Idaho. Each state has agreed to participate in the Council, and has enacted legislation which authorizes the governor to appoint two members to the Council. Wash.Rev.Code Ann. Sec. 43.52A.010; (1986); Or.Rev.Stat. Sec. 469.800; (1985); Mont.Code Ann. Sec. 90-4-401 (1985); Idaho Code Sec. 61-1201 (1985).
 
 
 4
 The Act directs the Council to prepare a regional energy plan which is to provide
 
 
 5
 a general scheme for implementing conservation measures and developing resources ... with due consideration by the Council for (A) environmental quality, (B) compatibility with the existing regional power system, (C) protection, mitigation, and enhancement of fish and wildlife ... and (D) other criteria which may be set forth in the plan.
 
 
 6
 Sec. 839b(e)(2). The Council adopted the final 1983 plan in April 1983. 48 Fed.Reg. 24,493 (June 1, 1983).
 
 
 7
 The Council and BPA operate independently of each other. Their functions directly overlap, however, under those portions of the Act which provide that certain BPA actions will be consistent with the Council's plan, Secs. 839b(d)(2), 839b(h), 839c(d)(3), 839d(b), 839d(c); that the Council can request certain action of BPA, Secs. 839b(f)(2), 839b(j); and that the Council can review BPA actions, Sec. 839b(i). See Hemmingway, The Northwest Power Planning Council: Its Origins and Future Role, 13 Envtl.L. 673 (1983).
 
 
 8
 The petition raises several issues. First, it attacks the 1983 plan as arbitrary and capricious under the Act and the Administrative Procedure Act, 5 U.S.C. Sec. 553 (1982). Second, petitioners attack the constitutionality of the Council itself, claiming that because the Council primarily influences federal, not state, government actions it constitutionally cannot be an interstate compact organization. Petitioners' third argument is that the Council violates the appointments clause, U.S. Const. art. II, Sec. 2, cl. 2, because the Council exercises significant authority over the federal government but has not been appointed by the President.
 
 I. The Council as a Compact Agency
 
 9
 The parties and amici disagree about whether to classify the Council as a federal agency or as an interstate compact organization. See U.S. Const. art. I, Sec. 10, cl. 3 ("compact clause"). Those attacking the Council as unconstitutional argue that it is a federal agency, despite the congressional disclaimer that it is not a federal agency. Sec. 839b(a)(2)(A)(iv). Those who defend the constitutionality of the Council characterize it as a compact agency, outside the scope of the appointments clause. We hold that it is a compact agency and that its members are not "federal officers" within the meaning of the appointments clause.
 
 
 10
 Congress' intention is clear from both the language of the statute, Sec. 839b(b), and from the legislative history, that the Council is not to be a federal agency and is not to be controlled by the federal government. 126 Cong.Rec. 30186 (1980) (remarks of Sen. McClure). The alternative establishment of the Council as a federal agency was a rejected second choice. Sec. 839b(b). One of the principal purposes of the Council is to represent state concerns about regional problems; Congress deemed it undesirable for a federal agency to represent state concerns to yet another federal agency. 126 Cong.Rec. 30181 (1980) (remarks of Sen. McClure) ("The Pacific Northwest does not need and candidly will not suffer lightly a federally imposed regional planning process with apparent input from Washington acting as a federal agency."). See also 126 Cong.Rec. 30181 (1980) (remarks of Sen. Hatfield); 126 Cong.Rec. 29808 (1980) (remarks of Rep. Dingell). Congress wanted to avoid conflicts with state law and to maintain accountability through the application of federal substantive and procedural law, see 126 Cong.Rec. 29808 (1980) (remarks of Rep. Dingell), but also wanted to avoid the potential constitutional problems of a federal agency composed of state appointees. H.R.Rep. No. 96-976 (Part II), 96th Cong., 2d Sess. 40-41 (majority views), 70-71 (supplemental views of Rep. Williams) (1980), U.S.Cong. & Admin.News (1980) pp. 5989 6038, 6039, 6063-6065; 126 Cong.Rec. 30186 (1980) (remarks of Sen. McClure).
 
 
 11
 The Supreme Court recently outlined some of the indicia of compacts. These are establishment of a joint organization for regulatory purposes; conditional consent by member states in which each state is not free to modify or repeal its participation unilaterally; and state enactments which require reciprocal action for their effectiveness. Northeast Bancorp, Inc. v. Board of Gov'rs of the Federal Reserve System, --- U.S. ----, 105 S.Ct. 2545, 2554, 86 L.Ed.2d 112 (1985). Even if all these indicia of compacts are present, the only interstate agreements which fall within the scope of the compact clause are those "tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States." Cuyler v. Adams, 449 U.S. 433, 440, 101 S.Ct. 703, 707, 66 L.Ed.2d 641 (1981). "The relevant inquiry must be one of impact on [the] federal structure." United States Steel Corporation v. Multistate Tax Commission, 434 U.S. 452, 471, 98 S.Ct. 799, 811, 54 L.Ed.2d 682 (1978); see Virginia v. Tennessee, 148 U.S. 503, 13 S.Ct. 728, 37 L.Ed. 537 (1893). If the joint activity does not affect the federal sphere, no approval by Congress is needed. If it affects the federal sphere, then Congress must authorize the activity. Cuyler v. Adams, 449 U.S. at 440, 101 S.Ct. at 707.
 
 
 12
 The Council satisfies all these indicia. The Council is an operational body established by reciprocal legislation whose effectiveness is conditioned upon binding legislative commitments by the states.
 
 
 13
 Petitioners and amicus Pacific Legal Foundation argue that certain features of the Council are unusual and that this unusual nature militates in favor of considering the Council to be a federal rather than a compact agency. The two aspects of the Council that petitioners and amicus claim are unusual are, first, that congressional approval of the Council was accorded before the states agreed to form it, and, second, that the Council's activities directly affect a federal agency.
 
 
 14
 An unusual feature of a compact does not make it invalid. A leading article by Professors Frankfurter and Landis sets the tone for the modern use of compacts. It encourages new uses. "The combined legislative powers of Congress and of the several States permit a wide range of permutations and combinations for governmental action.... Political energy has been expended on sterile controversy over supposedly exclusive alternatives instead of utilized for fashioning new instruments adapted to new situations." Frankfurter & Landis, The Compact Clause of the Constitution--A Study in Interstate Adjustments, 34 Yale L.J. 685, 688 (1925).
 
 
 15
 Moreover, the two features of the Council emphasized by petitioners and amicus are not unusual. Courts have considered both. "Congress may consent to an interstate compact by authorizing joint state action in advance or by giving expressed or implied approval to an agreement the States have already joined." Cuyler, 449 U.S. at 441, 101 S.Ct. at 708. See, e.g., Flood Control Act of 1936, 49 Stat. 1570 (1936), 33 U.S.C. Sec. 701d (1982); Crime Control Consent Act of 1934, 48 Stat. 909 (1934), 4 U.S.C. Sec. 112(a) (1982). Congress also may grant its consent conditional upon the states' compliance with specified terms. Cuyler, 449 U.S. at 439-40, 101 S.Ct. at 707-08. See James v. Dravo Contracting Co., 302 U.S. 134, 148 58 S.Ct. 208, 215, 82 L.Ed. 155 (1937).
 
 
 16
 It is also not unusual for the federal government to be involved in or to be directly affected by compact-created agencies. See, e.g., Washington Metropolitan Transit Regulation Compact, 74 Stat. 1031 (1960); Interstate Compact on the Potomac River Basin, 54 Stat. 748 (1940); Ohio River Valley Water Sanitation Compact, 54 Stat. 752 (1940); Upper Colorado River Basin Compact, 63 Stat. 31 (1949). Cf. Washington Metropolitan Area Transit Authority v. One Parcel of Land, 706 F.2d 1312, 1316 (4th Cir.), cert. denied, 464 U.S. 893, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983) (federal government delegates powers to a compact organization). The federal government has even participated as a member of interstate compact agencies. See, e.g., Delaware River Basin Compact, Pub.L. No. 87-328, 75 Stat. 688 (1961).
 
 
 17
 There is no bar against federal agencies following policies set by nonfederal agencies. The federal government has in fact agreed to be bound by state law in several areas. See California v. United States, 438 U.S. 645, 656-57, 98 S.Ct. 2985, 2991-92, 57 L.Ed.2d 1018 (1978) (federal reclamation projects must follow state water laws); Hancock v. Train, 426 U.S. 167, 178-80, 96 S.Ct. 2006, 2012-13, 48 L.Ed.2d 555 (1976) (federal government must comply with state air pollution standards); see also Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585, 604-06 (9th Cir.1981) (federal government must comply with state environmental standards); California v. EPA, 511 F.2d 963, 968-69 (9th Cir.1975) (federal agencies must comply with state water pollution standards), rev'd on other grounds, 426 U.S. 200, 211-13, 96 S.Ct. 2022, 2027-29, 48 L.Ed.2d 578 (1976). The federal government can be subject to state law where there is a clear congressional mandate and specific legislation which makes the authorization of state control clear and unambiguous. Hancock, 426 U.S. at 179, 96 S.Ct. at 2012.
 
 II. Appointment of Council Members
 
 18
 Petitioners argue that, even if the Council is a valid compact organization, the appointments clause of the United States Constitution requires that Council members be appointed not by the state governors, Sec. 839b(a)(3), but by the President because the Council exercises significant authority over the federal government. See U.S. Const. art. II, Sec. 2, cl. 2. The appointments clause is addressed to the separation of powers between the President and Congress. See Buckley v. Valeo, 424 U.S. 1, 126, 96 S.Ct. 612, 685, 46 L.Ed.2d 659 (1976). No court has yet held that the appointments clause prohibits the creation of an interstate planning council with members appointed by the states.
 
 
 19
 The Supreeme Court in Buckley said that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States' and must, therefore, be appointed" by the President. Id. Petitioners claim that appointment of Council members by the state governors violates Buckley.
 
 
 20
 Petitioners' theory, however, would outlaw virtually all compacts because all or most of them impact federal activities and all or most of them have members appointed by the participating states. See, e.g., Washington Metropolitan Area Transit Authority, 706 F.2d at 1314.
 
 
 21
 The appointments clause applies to (1) all executive or administrative officers, 424 U.S. at 123-26, 96 S.Ct. at 684-86; (2) who serve pursuant to federal law, 424 U.S. at 126, 96 S.Ct. at 685; and, (3) who exercise significant authority over federal government actions. 424 U.S. at 126-27 & n. 162, 96 S.Ct. at 685 & n. 162. Unless all three prongs of the Buckley test are met, there is no violation of the appointments clause.
 
 
 22
 The council members clear the second Buckley element. The Council members do not perform their duties "pursuant to laws of the United States." See Buckley, 424 U.S. at 126, 96 S.Ct. at 685. Rather, the Council members perform their duties pursuant to a compact which requires both state legislation and congressional approval. Without substantive state legislation, there would be no Council and no Council members to appoint. While congressional consent gives an interstate compact some attributes of federal law, the Council members' appointment, salaries and administrative operations are pursuant to the laws of the four individual states, within parameters set by the Act. Secs. 839b(a)(3), 839b(a)(4). More important, the states ultimately empower the Council members to carry out their duties. Federal law provides congressional consent for formation of the Council as it does for the creation of all compacts and compact agencies. Federal law also affects the substance of Council policy decisions because the Act constrains Council policy-making, see Secs. 839b(c), (d), (e), and subjects some Council operations to federal law. As with any compact, congressional consent did not result in the creation but only authorized the creation of the compact organization and the appointment of its officials. The appointment, salaries and direction of the Council members are state-derived.
 
 
 23
 We need not reach the first and third Buckley elements. The question, thus narrowed, because Council members do not serve pursuant to federal law, makes immaterial whether they exercise some significant executive or administrative authority over federal activity. It is likewise immaterial how their duties are classified: executive or administrative, because they perform these duties under a compact, rather than "federal law" within the meaning of Buckley.
 
 
 24
 Buckley is about maintaining the separation of powers within the federal government. This concern is not implicated here. In this case, unlike Buckley, Congress has not arrogated to itself a power that would otherwise be exercised by the President. See also Synar v. United States, 626 F.Supp. 1374 (D.D.C.1986) (per curiam) which holds the exercise of executive power by an officer who could be removed by Congress unconstitutional. The court in Synar stressed the "founders' often expressed fear 'that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches.' " Synar, 626 F.Supp. at 1401, quoting Buckley v. Valeo, 424 U.S. at 129, 96 S.Ct. at 687. Because Congress neither appoints nor removes the members of this Council, the balance of powers between Congress and the President is unaffected.
 
 
 25
 The Council violates neither the compact nor appointments clauses of the United States Constitution. The Act establishes an innovative system of cooperative federalism under which the states, within limits provided in the Act, can represent their shared interests in the maintenance and development of a power supply in the Pacific Northwest and in related environmental concerns.[2]
 
 III. Validity of Council's Plan
 
 26
 Having concluded that the Council is constitutional, we examine the substance of the 1983 plan. In this action petitioners challenge only that portion of the 1983 plan which establishes model energy conservation standards for new residential construction. Consequently, we so limit the following discussion.
 
 A. Standard of Review
 
 27
 Congress directed that the Administrative Procedure Act, 5 U.S.C. Secs. 701-06, govern our review of Council actions. Adoption of the plan is a final action subject to judicial review for the purposes of the Administrative Procedure Act. 16 U.S.C. Sec. 839f(e)(1)(A); see 5 U.S.C. Sec. 553.
 
 
 28
 While Congress intended that this court's scope of review of Council actions be consistent with 5 U.S.C. Sec. 706, the Act specifically declines to require that the Council follow the hearing provisions of 5 U.S.C. Secs. 554, 556, and 557, which govern formal rulemakings. Sec. 839f(e)(2). Consequently, this court will use neither the substantial evidence standard, 5 U.S.C. Sec. 706(2)(E), nor the de novo standard, 5 U.S.C. Sec. 706(2)(F). The remaining subsection of 5 U.S.C. Sec. 706 provides that an agency's factual findings may be set aside if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. Sec. 706(2)(A). We adopt this standard of review.
 
 
 29
 Although this court generally reviews legal questions de novo, United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), amici have urged that we review the Council's interpretations of the Act under a more deferential standard. Amici argue the general rule that where a statutory interpretation is "a contemporary construction of a statute by [those] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly, while they are yet untried and new," a court should review a statutory construction deferentially. Amer. Paper Inst., Inc. v. Amer. Elec. Power Service Corp., 461 U.S. 402, 422, 103 S.Ct. 1921, 1932, 76 L.Ed.2d 22 (1983), quoting Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Under this deferential review, a court examines only the reasonableness of the interpretation, and "need not find that [the agency's] construction [of its enabling act] is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." Amer. Paper Inst., 461 U.S. at 422-23, 103 S.Ct. at 1932-33; quoting Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).
 
 
 30
 The Supreme Court has deferred to BPA interpretations of the Act. ALCOA v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 104 S.Ct. 2472, 2479-80, 81 L.Ed.2d 301 (1984). This court has done likewise. See Department of Water and Power v. BPA, 759 F.2d 684, 690-91 (9th Cir.1985); Central Lincoln Peoples' Util. Dist. v. Johnson, 673 F.2d 1076, 1078, as amended, 686 F.2d 708, 710-11 (9th Cir.1982), rev'd on other grounds, 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984); Columbia Basin Land Protection Ass'n, 643 F.2d at 599-600 (and cases cited therein).
 
 
 31
 The preparation and consideration of the plan is a matter within Council authority over which the Act accords the Council considerable flexibility. For the same reasons that we defer to BPA expertise in construing other sections of the Act, therefore, we will defer to the Council's interpretations of Sec. 839b if reasonable.
 
 B. Model Conservation Standards
 
 32
 The Act requires that the Council's plan afford priority to certain resources:
 
 
 33
 The plan shall ... give priority to resources which the Council determines to be cost-effective. Priority shall be given: first, to conservation; second, to renewable resources; third, to generating resources utilizing waste heat or generating resources of high fuel conversion efficiency; and fourth, to all other resources.
 
 
 34
 Sec. 839b(e)(1).
 
 
 35
 The Act further requires that the plan include model conservation standards, Sec. 839b(f)(1), Sec. 839b(e)(3)(A). The Council is directed to adopt model conservation standards applicable to new and existing structures which reflect "geographic and climatic differences within the region" and which "produce all power savings that are cost-effective for the region and economically feasible for consumers."[3] Sec. 839b(f)(1) (emphasis added). The Act defines "cost effective" resources as those which are forecast "to be reliable and available ... to meet or reduce the electric power demand ... of the consumers ... at an estimated incremental system cost no greater than that of the least-cost similarly reliable and available alternative measure or resource, or combination thereof." Sec. 839a(4)(A). The Act defines the term "system cost" as an "estimate of all direct costs of a measure or resource over its effective life including [direct and quantifiable environmental costs and benefits]." Sec. 839a(4)(B). Because the term "economically feasible" is not defined in the Act, the Council's definition is a major point of contention in this action.
 
 
 36
 Rather than making a single forecast of the need for energy resources, the plan makes four separate, 20-year forecasts of electricity demand, each with separate resource needs. Under the lowest-growth forecast, conservation is the only new energy resource needed to satisfy regional energy demand.[4] Plan Vol. 1 at 5-2 (figure 5-1). Under the medium-low, medium-high and high-growth forecasts, demand is satisfied by a mixture of conservation, hydroelectric, cogeneration, coal and combustion turbine energy sources in accord with statutory priorities. Id. (figures 5-2, 5-3, 5-4).
 
 
 37
 The Council has predicted the probability that each of these growth forecasts will be realized. It has predicted that it is "very unlikely" that growth will be slower than the low-growth forecast or faster than the high-growth forecast. The plan predicts a 33 per cent chance that growth will be more than the low forecast but less than the medium-low forecast; a 45 per cent chance of growth falling between the medium-low and medium-high forecasts; and a 22 per cent chance that growth will exceed the medium-high forecast but be less than the high forecast. Plan Vol. 1 at 5-17 (and figures 5-13, 5-14).
 
 
 38
 The 1983 plan predicts that the last resource to be acquired under the highgrowth forecast will be a coal generating plant capable of producing electricity at a cost of slightly over four cents per kilowatt hour (4cents/kwh). The plan considers that conservation measures which "could displace this coal plant would be considered cost-effective." Plan Vol. 1 at 7-1. It defines as cost effective, therefore, any conservation measure with a marginal cost less than 4cents/kwh in current dollars. Id.
 
 
 39
 The Council concluded that its conservation standards are both cost effective for the region and economically feasible for consumers under Sec. 839b(f)(1) and recommended that BPA impose a surcharge for nonconforming electricity usage beginning January 1, 1986 as authorized by Sec. 839b(f)(2). Plan Vol. 1 at 1-3, 11, Vol. 2 Appendix J at Preface 4.
 
 
 40
 Petitioners argue that it is unreasonable for the Council to interpret cost effectiveness based upon a forecast which the Council itself concedes is "very unlikely." Petitioners argue that the Council cannot adopt a cutoff for cost effectiveness unless it is "more likely than not" that the predictions upon which it is based will be realized. See Industrial Union Department v. American Petroleum Inst., 448 U.S. 607, 653, 100 S.Ct. 2844, 2869, 65 L.Ed.2d 1010 (1980) (OSHA must show that it is more likely than not that health hazard would exist but for its regulations); Bunker Hill Co. v. EPA, 572 F.2d 1286, 1301 (9th Cir.1977) (EPA cannot establish standards which demand technology which is experimental or only theoretically feasible).
 
 
 41
 Unlike the occupational health statute in Industrial Union Department or the environmental protection statute in Bunker Hill, however, the Act allows the Council the flexibility to define cost effectiveness not in terms of current energy needs but by reference to whether a resource is "forecast ... to be ... available within the time it is needed." Sec. 839a(4)(A) (emphasis added). See 126 Cong.Rec. H-9514 (daily ed. Sept. 23, 1980). The Council is given the statutory mandate to make a forecast and to base its conservation plan on this forecast. Petitioners also argue that the Council is basing its plan upon projected energy costs and demands that the Council itself is unable to predict with accuracy. The Act does not require the Council to follow any particular method or timetable for forecasting the amount or cost of future energy demand; we do not find the 20-year forecast or the 4cents/kwh cutoff to be unreasonable in light of the inherent indefiniteness of long-term energy forecasting.
 
 
 42
 The Act requires the plan to define cost effectiveness in terms of "incremental system cost," which the Council has interpreted to be an estimate of all direct and environmental costs of all the measures required by the conservation standards as a whole. See Sec. 839a(4)(B). Consequently, the Council's measure of cost effectiveness is based on the average cost of a package of conservation measures, none of which has a marginal cost exceeding 4cents/kwh. Although it selected 4cents/kwh as the outer limit for cost effective conservation components, the Council estimates that the average system cost of its conservation standards is only 1.8cents/kwh, Plan Vol. 1 at 10-4, considerably less than the cost of other energy resources. See Plan Vol. 1 at 4-3, 4-6 (figure 4-4, table 4-3).
 
 
 43
 Petitioners allege that this interpretation of cost effectiveness is contrary to the Act. They contend that the plan must examine the cost effectiveness of each individual conservation measure because the Act uses the singular in referring to cost effectiveness of "any measure or resource." Sec. 839a(4)(A). The Council's approach is correct. The Act does not require that each individual component of the model conservation standards be cost effective. The purpose of the conservation standards is to require the Council to examine cost effectiveness of standards which, when adopted in their entirety, result in cost effective energy savings. All that is required is that the model conservation standards be cost effective, when viewed as a whole. See Sec. 839b(f)(1).
 
 
 44
 Petitioners also allege that the Council's definition of cost effectiveness is unreasonable because the 1983 plan does not adequately consider potential conservation in the government, commercial and industrial sectors. The plan does include operational conservation programs applicable to government, Plan Vol. 1 at 10-17, 10-18, commerce, Plan Vol. 1 at 10-14, 10-15, and industry, Plan Vol. 1 at 10-15, 10-16, and sets conservation requirements for all sectors. Plan Vol. 1 at 7-7--7-12, 10-12--10-17; see Plan Vol. II Appendix J. The model energy conservation standards for new buildings apply equally to residential and nonresidential structures. See Plan Vol. II Appendix J. Whether the plan provides similar or dissimilar conservation standards for different sectors is a matter within Council discretion under the Act. See Secs. 839a(4)(A), 839b(f)(1). We find the Council's interpretation of the term "cost effective" to be reasonable.
 
 
 45
 In addition to requiring cost effectiveness for the region as a whole, the Act requires the model conservation standards to be economically feasible for consumers. Sec. 839b(f)(1). The Act does not define the term but the plan contains a functional definition:
 
 
 46
 Although a house built to the Council's model standard will have a slightly higher initial cost, over the life of the house the consumer will be economically better off than if living in a house built to current codes.
 
 
 47
 Plan Vol. 1 at 7-3.
 
 
 48
 In measuring economic feasibility, the plan considers the cost and efficiency of the conservation standards as a whole. Petitioners argue that economic efficiency, like cost effectiveness, should properly be measured on a component-by-component basis. Petitioners assert that a particular conservation component is economically feasible only if that particular component pays for itself: each individual component must save the homeowner more in electricity than it adds to the cost of the house. Instead of reflecting the marginal (or avoided) cost of energy resources, the petitioners insist, economic efficiency should be a function of the average market cost for electricity, which is not predicted to exceed 3.6cents/kwh. Plan Vol. 1 at 4-6 (table 4-3). Because the plan relies on marginal cost to measure economic efficiency, petitioners argue, the standards for economic feasibility are only theoretically feasible and therefore unreasonable. See Bunker Hill, 572 F.2d at 1301.
 
 
 49
 The Council believes that marginal cost is a more accurate measure of energy cost than is average cost because of differences in market price for different consumers. See Plan Vol. 1 at 4-6. Furthermore, economic efficiency should be based upon avoided cost which is measured by marginal, not average, cost. See 126 Cong.Rec. 30181 (1980) (report of the Office of Technology Assessment). Cf. H.R.Rep. No. 96-976 (Part I), 96th Cong., 2d Sess. 50 (1980), U.S.Code Cong. & Admin.News 1980 p. 5989 ("cost comparison is done on the basis of incremental, or marginal, costs").
 
 
 50
 The plan's definition is consistent with congressional intent. See S.Rep. No. 96-272, 96th Cong., 1st Sess. 25 (1979) (the cost to consumers must be such that "the cost of complying with the standards ... should not exceed, for the individual or entity to which the standards apply, the direct financial savings produced by compliance"). Petitioners have not shown the Council's definition of economic feasibility to be unreasonable.
 
 
 51
 Finally, the conservation standards cannot be economically feasible for owners of rental housing, petitioners argue, because the market will not support additional rents necessary to compensate for an increase in construction costs. Not only have petitioners not presented any support for their assertion, but the Council notes that homes which meet the conservation standards may command higher rents because of the savings tenants can enjoy in energy costs. Petitioners have not provided us with sufficient evidence upon which to disturb the Council's conclusion that the standards are economically feasible for owners of rental housing. Application of the model standards to rental housing is not arbitrary or capricious.C. Methodology for determining conservation value
 
 
 52
 Petitioners challenge the technical, analytic process by which the Council arrived at its model conservation standards. The dispute centers on whether it was acceptable for the Council to arrive at its standards using industry engineering standards and computer simulations of energy usage, conservation and efficiency of various conservation measures.
 
 
 53
 Petitioners argue that the Council's failure to conduct component field testing to determine the value of various conservation measures was an abuse of discretion, and that such component testing is statutorily mandated. See, e.g. Secs. 839a(4)(A), 839b(f)(1). They assert that component testing was feasible, would have yielded valuable data and could have been done in the two-year period the Act allows for preparation of the 1983 plan. See Sec. 839b(d).
 
 
 54
 The Act does not, however, mandate any particular method of forecasting under either the definition of cost effectiveness, Sec. 839a(4)(A), or the section requiring the preparation of model conservation standards, Sec. 839b(f)(1). The Council is given the discretion under the statute to develop a forecast which provides model conservation standards that are cost effective, economically efficient and reflect regional geographic and climatic differences. Sec. 839b(f)(1). See S.Rep. No. 96-272, 96th Cong., 1st Sess. 2 (1979) (value of conservation is to be determined "on the basis of a methodology developed by the Council as part of the plan"). As we have concluded above, the Council's use of four, 24-year forecasts was reasonable in light of its statutory mandate.
 
 
 55
 To test the value of particular conservation measures, the Council used a computer simulation model, Plan Vol. 1 at 10-4, Glossary-3, combined with standardized coefficients for building materials, components and assemblies. See generally Plan Vol. II Appendix K. The choice of methodology is a highly technical question which falls within the unique expertise of the Council. Unless an abuse of discretion is demonstrated, this court will not substitute its judgment on particular testing methodology. See Department of Water & Power v. BPA, 759 F.2d at 691 (and cases cited therein). While petitioners may be correct in asserting that the Council could have done component testing in lieu of simulations, the Act does not require the Council to do so. The methodology used in the 1983 plan employed accepted industry standards and principles of analysis. See American Society of Heating, Refrigerating and Air Conditioning Engineers, Inc., Ashrae Handbook 1981 Fundamentals (1981). We express no opinion on the methodology and definitions proposed by the petitioners. Petitioners have not presented evidence before this court to raise serious doubt about the accuracy or reliability of the Council's computer simulation program or the Handbook of Fundamentals, upon which the Council relied. We conclude that the Council did not abuse its discretion when it chose to rely upon industry standards and computer simulations in its calculations of the value of various conservation components.
 
 
 56
 In our evaluation of the validity of the Council's technical methodology and of the conservation standards, two factors are crucial. First is the technical nature of the Council's decisions which even Congress recognized should be the result of technical, scientific choices. See Secs. 839b(c)(11)-(13), 839b(g). Second is the deferential standard for our review of the Council's action which we have already recognized above. The Council's interpretations of the Act are reasonable and its model conservation standards are not arbitrary or capricious. See Chevron, U.S.A., 104 S.Ct. at 2782-83 (and cases cited therein); see generally 5 K.C. Davis, Administrative Law Treatise Sec. 29.20 (2d ed. 1984).
 
 IV. Application of State Environmental Laws
 
 57
 Petitioners claim that the 1983 plan violates state environmental protection laws because the Council did not prepare an environmental impact assessment on the model conservation standards. See Wash.Rev.Code Ann. Secs. 43.21C.010, 43.21C.030 (Washington environmental protection statute); Mont.Code Ann. Secs. 75-1-101, 75-1-201 (Montana Environmental Policy Act).
 
 
 58
 To the extent that the Council functions as a compact, it is considered the state-created agency of each state. Jacobson v. Tahoe Regional Planning Agency, 566 F.2d 1353, 1358 (9th Cir.1977), aff'd, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). A state can impose state law on a compact organization only if the compact specifically reserves its right to do so. See People v. City of South Lake Tahoe, 466 F.Supp. 527, 537 (E.D.Cal.1978) (compact specifically reserved the right to impose regulations which were more stringent than those imposed by the compact organization itself). Neither Washington nor Montana reserved such rights in their statutes agreeing to establishment of the Council. See Wash.Rev.Code Sec. 43.52A.010; Mont.Code Ann. Sec. 90-4-401.
 
 
 59
 We need not decide whether or to what extent federal environmental laws, e.g. 42 U.S.C. Sec. 4321 et seq., would apply. Neither BPA nor the Council has taken a substantial federal action affecting the human environment which might trigger application of federal environmental laws. See 42 U.S.C. Sec. 4332(C)(ii).
 
 
 60
 PETITION DENIED.
 
 BEEZER, Circuit Judge, dissenting:
 
 61
 This case raises a novel issue under the Appointments Clause of the United States Constitution. We must consider whether Congress may delegate certain federal authority to a body, acting through state-appointed officers, or whether such responsibilities must be reserved to a properly constituted federal agency acting through constitutionally appointed executive officials.
 
 
 62
 At issue is the constitutionality of the method of selecting the members of the Pacific Northwest Electric Power and Conservation Planning Council. Because I conclude that the method of selecting the members of the Council violates the Appointments Clause, I respectfully dissent.
 
 
 63
 * Background
 
 
 64
 In 1937, Congress created the Bonneville Power Administration ("BPA"), a federal agency charged with the production, marketing, and distribution of electric power in the Pacific Northwest. In 1980, Congress created the Pacific Northwest Electric Power and Conservation Planning Council ("Council"), which is responsible for promulgating a regional conservation and electric power plan. Pacific Northwest Electric Power Planning and Conservation Act ("the Planning Act"), 16 U.S.C. Secs. 839-839h. The Council is composed of members appointed by the governors of Idaho, Montana, Oregon, and Washington. Id. Sec. 839b(a)(2)(B). Each state has passed implementing legislation. Idaho Code Secs. 61-1201 to -1207; Mont.Code Ann. Secs. 90-4-401 to -404; Or.Rev.Stat. Sec. 469.800-.845; Wash.Rev.Code Secs. 43.52A.010-.050.
 
 
 65
 The Council adopted a plan on June 1, 1983. 48 Fed.Reg. 24,493 (1983). Pursuant to 16 U.S.C. Sec. 839f(e)(1)(A), the Seattle Master Builders Association and several other business organizations filed a petition for review in this court. The United States of America intervened on behalf of the Council.
 
 II
 
 66
 The Applicability of the Appointments Clause
 
 
 67
 The petitioners argue that the members of the Council must be selected in accordance with the Appointments Clause, which states:
 
 
 68
 [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.
 
 
 69
 U.S. Const. art. II, Sec. 2, cl. 2 (emphasis added). The Council argues that the Appointments Clause is inapplicable because the Council is an interstate compact agency. As a result, two threshold issues must be addressed: (1) whether the Council is an interstate compact agency, and (2) whether the Appointments Clause applies to the members of interstate compact agencies.
 
 A. The Existence of an Interstate Compact
 
 70
 Over half a century ago, Felix Frankfurter and James Landis argued that interstate compacts could provide an effective means for allowing coordinated federal-state control of electric power. Frankfurter & Landis, The Compact Clause of the Constitution--A Study in Interstate Adjustments, 34 Yale L.J. 685, 717 (1925). The Council, joined by the four Pacific Northwest states and the National Governors' Association as amici curiae, argues that the Planning Act created an interstate compact. The petitioners, joined by the Pacific Legal Foundation as amicus curiae, argue that the Council is a federal agency.
 
 
 71
 In form, the creation of the Council resembles the creation of an interstate compact. After listing the purposes of the Council, the Planning Act states: "To achieve such purposes and facilitate cooperation among the States of Idaho, Montana, Oregon, and Washington, and with the Bonneville Power Administration, the consent of Congress is given for an agreement described in this paragraph and not in conflict with this chapter...." 16 U.S.C. Sec. 839b(a)(2). The Planning Act also states that the appointment of members by three states "shall constitute an agreement by the States establishing the Council and such agreement is hereby consented to by the Congress." Id.
 
 
 72
 On the other hand, the Council lacks several of the classic indicia of an interstate compact. For example, the Supreme Court recently noted that two reciprocal state statutes were unlike an interstate compact because "[n]either statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally." Northeast Bancorp, Inc. v. Board of Governors, --- U.S. ----, 105 S.Ct. 2545, 2554, 86 L.Ed.2d 112 (1985). None of the Pacific Northwest states conditioned their agreement to participate in the Council on action by the other states. All four states are free to repeal their statutes unilaterally.
 
 
 73
 More significantly, the Planning Act authorized the creation of the Council on the consent of only three of the four states. 16 U.S.C. Sec. 839b(a)(2). The Planning Act does not, however, limit the geographical scope of the Council's responsibilities in such a case. Suppose, for example, that Idaho, Montana, and Oregon had joined the Council, but that Washington had declined to join. The Council, composed of members from Idaho, Montana, and Oregon, would have been responsible for preparing a plan for all four states. In that case, the Council would have taken action that could have substantive effects in a nonmember state.[1] If the Council is truly an interstate compact agency, that result would not be possible.
 
 
 74
 In fact, the "region" serviced by the BPA includes portions of Nevada, Utah, Wyoming, and California. 16 U.S.C. Secs. 839a(14)(A) & (B). To the extent the Council has authority over BPA actions, the Council also exercises authority affecting electric utility consumers living outside the four states from which the Council members were appointed. The four states involved have therefore agreed to participate in establishing policy and standards, not for each other, but for a federal agency with regional authority extending beyond those states. This is strong evidence that Congress did not intend the establishment of an interstate compact.
 
 
 75
 Finally, the Council lacks the most important indicia of an interstate compact agency: a state purpose. While it is apparent that the Pacific Northwest states have a strong interest in obtaining representation in regional policy making by the BPA, the purpose of the Council is not representative in nature. Instead, the purpose of the Council is to guide the actions of the BPA. Because the states have no right to exercise control over the BPA, that is not a state purpose. If the Council was responsible for coordinating energy and conservation planning at the state level, it would have a state purpose. See Frankfurter & Landis, supra, at 717 (proposing "[c]oordinated [electric power] regulation among groups of States, in harmony with Federal administration over developments on navigable streams and in the public domain"). The Council has no such responsibility.
 
 
 76
 It is true that interstate compacts by their very nature have federal law implications and provide a vehicle for states to act in a manner in which a state may not act without congressional consent, thus altering a state's sphere of authority. See L. Tribe, American Constitutional Law Sec. 6-31, at 402 (1978). Congressional consent does "transform an interstate compact ... into a law of the United States," Cuyler v. Adams, 449 U.S. 433, 438, 101 S.Ct. 703, 707, 66 L.Ed.2d 641 (1981), in that federal judicial interpretation of a compact under the Supremacy Clause controls over a state's application of its own law. See West Virginia ex rel. Dyer v. Sims, 341 U.S. 22, 33, 71 S.Ct. 557, 563, 95 L.Ed.2d 713 (1951) (Reed, J., concurring). However, granting a body of state-appointed officials the power to constrain the actions of a federal executive agency is quite another thing. That is not a legitimate function of an interstate compact agency.
 
 
 77
 While it is difficult to characterize the Council as an interstate compact agency, it is easy to characterize the Council as a federal agency. The classic definition of an "agency" is "a governmental authority, other than a court and other than a legislative body, which affects the rights of private parties through either adjudication or rulemaking." 1 K. Davis, Administrative Law Treatise Sec. 1.01, at 1 (1st ed. 1958); see id. Sec. 1.02 (2d ed. 1978). The Council is a "governmental authority," and its plan constitutes "rulemaking." See 16 U.S.C. Sec. 839b(a)(4) (stating that the Council is subject to the same general administrative rules as the BPA and the Federal Energy Regulatory Commission). As this case demonstrates, the Council's plan "affects the rights of private parties." The Council is thus an agency. Because the Council has a federal purpose and receives its authority from federal law, the Council is a federal agency.
 
 
 78
 In sum, the Council is not an ordinary interstate compact agency. At best, the Council can be characterized as a federal agency created through the interstate compact process. At worst, the Council is a federal agency with its members appointed by state governors. Under either approach, the Council is not exempt from the requirements of the Appointments Clause.
 
 
 79
 B. The Applicability of the Appointments Clause to Interstate Compacts
 
 
 80
 The Council argues that interstate compacts are exempt from the Appointments Clause. Assuming for present purposes that the Council can be treated as an interstate compact agency, this argument raises a single issue: whether persons who would ordinarily be regarded as "Officers of the United States" for purposes of the Appointments Clause need not be appointed in accordance with that provision when their authority is based on an interstate compact. A careful review of the relevant constitutional provisions reveals that the members of interstate compact agencies are not exempt from the Appointments Clause.
 
 
 81
 Initially, it should be noted that the Appointments Clause is a grant of power to the executive branch. The President has the power to nominate federal officers and, with the advice and consent of the Senate, to appoint them.[2] See Buckley v. Valeo, 424 U.S. 1, 131, 96 S.Ct. 612, 688, 46 L.Ed.2d 659 (1976) (per curiam); L. Tribe, American Constitutional Law Sec. 4-8 (1978). In the absence of specific constitutional authority, Congress may not usurp the President's power to nominate federal officers. See Buckley, 424 U.S. at 135, 96 S.Ct. at 689 (holding that the Necessary and Proper Clause, U.S. Const. art. II, Sec. 8, cl. 18, does not authorize congressional abrogation of the Appointments Clause); L. Tribe, supra, Sec. 4-8, at 184-85 (noting that the Appointments Clause "seeks to preserve an executive check upon legislative authority").
 
 
 82
 Congressional authority would be enhanced at the expense of the executive if Congress had the unrestricted power to confer the appointment authority on third parties. To the extent that a governor can appoint a member of an interstate compact agency who would otherwise be subject to the Appointments Clause, the power of the executive branch is diminished.[3]
 
 
 83
 The Compacts Clause, on the other hand, is not a grant of power either to the states or to Congress. On the contrary, it is a prohibition: "No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State ...." U.S. Const. art. I, Sec. 10, cl. 3. The Compacts Clause does not give Congress the power to create interstate compacts. Similarly, the Compacts Clause does not expressly authorize states to enter into compacts. Instead, the Compacts Clause is a prohibition with an exception. Cf. U.S. Const. amend. X ("The powers not ... prohibited by [the Constitution] to the States, are reserved to the States respectively ...."). Indeed, most of the cases that have analyzed the Compacts Clause have involved unauthorized interstate compacts. E.g., Northeast Bancorp, 105 S.Ct. at 2554-55.
 
 
 84
 In light of the language of the two clauses, it is apparent that the Compacts Clause is not an exception to the Appointments Clause. The executive branch has the unqualified right to nominate all federal officers. Congress lacks the constitutional authority to delegate that power to the states. Moreover, the Supremacy Clause prevents the states from usurping the executive branch's power. U.S. Const. art. VI, cl. 2. Accordingly, the Council's alleged status as an interstate compact agency does not exempt it from scrutiny under the Appointments Clause.
 
 III
 The Constitutionality of the Council
 
 85
 It is next necessary to determine whether the method of selecting Council members is constitutional under the Appointments Clause. In light of the Supreme Court's decision in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), it is apparent that the relevant provisions of the Planning Act are unconstitutional.A. The Constitutional Status of Council Members
 
 1. The Appropriate Legal Standard
 
 86
 The Council argues that the Appointments Clause applies only to employees of the federal government. In essence, the Council is arguing that the applicability of the Appointments Clause is determined by the status of the officer, rather than by the officer's power and authority. In Buckley, the Supreme Court specifically rejected that approach and instead emphasized substance over form:
 
 
 87
 The Appointments Clause could, of course, be read as merely dealing with etiquette or protocol in describing "Officers of the United States," but the drafters had a less frivolous purpose in mind....
 
 
 88
 We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in United States v. Germaine, [99 U.S. (9 Otto) 508, 25 L.Ed. 482 (1878) ], is a term intended to have substantial meaning. We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by Sec. 2, cl. 2, of that Article.
 
 
 89
 424 U.S. at 125-26, 96 S.Ct. at 685. Accordingly, the issue is whether Council members exercise "significant authority pursuant to the laws of the United States."[4]
 
 
 90
 2. Significant Authority Pursuant to Federal Law
 
 
 91
 The Council does not argue that it lacks significant authority pursuant to federal law. Indeed, the United States government concedes that several provisions of the Planning Act may give the Council "significant" authority pursuant to federal law. An examination of the Planning Act reveals that the Council is not an advisory planning council. Instead, the Council's plan has substantive effects. By issuing the plan, the Council exercised significant authority under federal law.
 
 
 92
 Initially, the Planning Act requires the BPA to act in a manner consistent with the plan. Section 839b(d)(2) states: "Following adoption of the plan and any amendment thereto, all actions of the Administrator [of the BPA] pursuant to section 839d of this title ["Conservation and resource acquisition"] shall be consistent with the plan and any amendment thereto, except as otherwise specifically provided in this chapter." 16 U.S.C. Sec. 839b(d)(2). The Administrator is empowered to determine whether a resource acquisition or conservation decision is consistent with the plan. Id. Sec. 839d(a)(1), (b)(1). As a result, section 839b(d)(2) does not give the Council the power to control the BPA. The issue, however, is not whether the Council can control the BPA, but whether the Council exercises significant authority pursuant to federal law. The ability to issue a plan with which the BPA must act consistently constitutes significant authority pursuant to federal law.
 
 
 93
 The Council's authority, however, extends beyond the ability to promulgate the plan. Under section 839b(i), the Council is authorized to review the BPA's actions "to determine whether such actions are consistent with the plan ... [and] the extent to which the plan ... is being implemented." Id. Sec. 839b(i). Under section 839b(j), the Council can request the Administrator to take action. Id. Sec. 839b(j)(1). The Administrator must respond in writing within ninety days. Id. Sec. 839b(j)(2). If the Administrator refuses to take the requested action, the Council can request an informal hearing and a final, reviewable decision. Id. Sec. 839b(j)(3). While it is true that the Council cannot force the BPA to take action consistent with the plan, this mechanism allows the Council to exert pressure on the BPA. It also allows the Council to obtain judicial review of the BPA's inaction.
 
 
 94
 In addition, the Council has the power to block major resource acquisitions or conservation measures that are inconsistent with the plan. Within sixty days after the Administrator's decision, the Council may determine by a majority vote that the proposed acquisition or measure is inconsistent with the plan. Id. Sec. 839d(c)(2)(A); see also id. Sec. 839d(c)(2)(B) (stating that the Council may declare a proposed major acquisition or measure inconsistent with the criteria for developing a plan if no plan is in effect). Section 839d(c)(3) states:
 
 
 95
 The Administrator may not implement any [major resource acquisition or conservation measure] that is determined ... by ... the Council to be inconsistent with the plan ...
 
 
 96
 (A) unless the Administrator finds that, notwithstanding such inconsistency, such resource is needed to meet the Administrator's obligations under this chapter, and
 
 
 97
 (B) until the expenditure of funds for that purpose has been specifically authorized by Act of Congress enacted after December 5, 1980.
 
 
 98
 Id. Sec. 839d(c)(3) (emphasis added). Under that provision, the Council has authority to block a major resource acquisition or conservation measure unless the BPA can persuade Congress to overrule the Council.
 
 
 99
 Section 839c(d) gives the Council similar authority. The Planning Act establishes a limitation on the amount of electric power that the BPA can sell to direct service industrial customers. Id. Sec. 839c(d)(1). If the BPA seeks to exceed that limitation, Council approval is required. Id. Sec. 839c(d)(3).
 
 
 100
 Finally, the Planning Act allows the Council to recommend the imposition of a surcharge on the electric rates of customers in areas that have not enacted adequate conservation programs. Id. Sec. 839b(f)(2). In the absence of such a recommendation, the BPA lacks authority to impose such a surcharge.
 
 
 101
 In sum, the Planning Act gives the Council the ability to produce significant substantive effects. As a result, the members of the Council are "Officers of the United States." Because the President did not appoint the members of the Council, the Council's actions are contrary to the Constitution and therefore void.
 
 3. Other State Officials
 
 102
 The Council argues that invalidation of the Council under the Appointments Clause would mean that various other state officials must be appointed by the President. This argument overlooks the peculiar nature of the Council. On examination, each of the classes of state officials suggested by the Council lacks the characteristics that make the Council subject to the Appointments Clause.
 
 
 103
 The first class is composed of state officials who spend federal funds. The Council's brief states that "the provision of conditional federal grants for elementary education, for example, does not bring the appointment of school boards and principals under the supervision of the President; yet these state officials establish plans that govern the manner in which federal money may be spent." While the Council is correct, this class of officials can be distinguished from the Council in three ways. First, these officials do not exercise significant authority under federal law. They do not decide whether funds will be granted or the size of the grant. Second, these officials do not exercise control over the actions of federal officials. Third, these state officials have no authority at all until the funds are received by the state. At that point, the funds are, in effect, state funds.
 
 
 104
 The second class is composed of state judges. As the Council notes, state judges can decide federal issues. A state judge's authority, however, derives solely from state law. If a state chooses to create courts of general jurisdiction, those courts cannot refuse to decide federal issues. See C. Wright, The Law of Federal Courts Sec. 45 (4th ed. 1983). The Supremacy Clause requires state judges to obey federal law, but does not allow those judges to change or to create federal law.
 
 
 105
 The third class is composed of state legislators. To the extent that state statutes do not discriminate against federal entities or interfere with federal activites, federal agencies are subject to those statutes. See Hancock v. Train, 426 U.S. 167, 179-80, 96 S.Ct. 2006, 2012-13, 48 L.Ed.2d 555 (1976); United States v. Texas, 695 F.2d 136, 138 n. 6 (5th Cir.), cert. denied, 464 U.S. 933, 104 S.Ct. 336, 78 L.Ed.2d 305 (1983). In some cases, Congress specifies that federal entities must obey state laws that would otherwise be preempted. See California v. United States, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). In those cases, Congress has merely narrowed the scope of federal preemption. The state legislatures are not authorized to pass legislation solely for the purpose of regulating federal agencies.
 
 
 106
 The final class is composed of the members of ordinary interstate compact agencies. A compact operates as federal law in the sense that construction of the compact's terms presents a federal question and that state law is not a defense to noncompliance with the compact's terms. See L. Tribe, supra, Sec. 6-31, at 402. The Council, however, is not an ordinary compact. The Council was not created for a state purpose. If, for example, the Council had the power to coordinate energy planning at the state level, it would be valid to that extent. Likewise, Congress perhaps could delegate authority over regional energy production and distribution to an interstate compact agreed to by the states in that region, but Congress may not retain that authority in a federal executive agency (BPA) and create or approve a state-appointed body (the Council) that may subject that executive agency, at least in part, to its control. Unlike ordinary compacts, the Council can produce substantive effects under federal law. Because the Council's actions are at least partially binding on the BPA, the members of the Council must be appointed in accordance with the Appointments Clause.
 
 B. Innovative Cooperative Federalism
 
 107
 The Council, along with the four Pacific Northwest states and the National Governors' Association as amici curiae, argues that the Planning Act represents an innovative program of cooperative federalism. Noting that the Appointments Clause was intended to prevent the accumulation of power in one branch of government, the Council asserts that "the innovative form of federalism at issue in this case better serves the concern of the Framers than would a federally appointed council or a complete delegation of both planning and execution functions to the Administrator." Regardless of the accuracy of that assertion, the Council's position lacks a basis in the text of the Constitution. The members of the Council exercise significant authority pursuant to federal law. As a result, the system of federalism embodied in the Constitution gives the power to select Council members to the executive branch.
 
 
 108
 In essence, the Council is arguing that the allocation of powers and duties in the Constitution should be relaxed in this case for policy reasons. Similar arguments have frequently been rejected. During the Great Depression, for example, the government argued that the existence of a domestic emergency justified legislation that would otherwise be unconstitutional. See Belknap, The New Deal and the Emergency Powers Doctrine, 62 Texas L.Rev. 67 (1983). The Supreme Court rejected that argument:
 
 
 109
 Extraordinary conditions do not create or enlarge constitutional power. The Constitution established a national government with powers deemed to be adequate, as they have proved to be both in war and peace, but these powers of the national government are limited by the constitutional grants. Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary.
 
 
 110
 A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 528-29, 55 S.Ct. 837, 842-43, 79 L.Ed. 1570 (1935); see Belknap, supra, at 92-98.
 
 
 111
 More recently, the Supreme Court considered the validity of the legislative veto. Rejecting numerous policy arguments, the Court held that the legislative veto is unconstitutional. INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In a dissenting opinion, Justice White focused on the functional utility of the legislative veto. Id. at 967, 103 S.Ct. at 2792 (White, J., dissenting). The majority rejected that approach:
 
 
 112
 The choices we discern as having been made in the Constitutional Convention impose burdens on government processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked. There is no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit constitutional standards may be avoided, either by the Congress or by the President. With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.
 
 
 113
 Id. at 959, 103 S.Ct. at 2788 (citation omitted).
 
 
 114
 It is true that the legislative veto and the emergency powers doctrine involved constitutional issues different from those at issue in this case. Nevertheless, those cases illustrate the importance of maintaining the basic structure set forth in the Constitution. See United States v. Woodley, 751 F.2d 1008, 1014 (9th Cir.1985) (en banc) ("Changes in [the Constitution] must come through constitutional amendment, not through judicial reform based on policy arguments."). The Council cannot be upheld as an innovative form of cooperative federalism.
 
 IV
 Conclusion
 
 115
 Congress anticipated the possibility that the provisions for formation of the Council might be found unconstitutional. See 16 U.S.C. Sec. 839h (specifically stating that the provisions creating the Council are separable). In fact, Congress provided for the alternative establishment of the Council as a federal agency if the courts invalidated the creation of the Council as a compact. Id. Sec. 839b(b)(1)(A). Under the alternative scheme, the governors of the four Pacific Northwest states may nominate the Council members subject to the approval of the Secretary of Energy. Id. Sec. 839b(2). Similar schemes have been upheld. See United States v. Hartwell, 73 U.S. (6 Wall.) 385, 18 L.Ed. 830 (1867); Woodford v. United States, 77 F.2d 861, 863-64 (8th Cir.1935). In this case, however, Congress has usurped the constitutionally delegated power of the executive branch by authorizing state governors to appoint the members of the Council. I would grant the petition for review and vacate the plan.
 
 
 
 [1]
 Amicus briefs have been filed by the States of California, Oregon, Idaho, Montana and Washington, the City of Tacoma, Washington, the National Governors' Association and two public interest organizations
 
 
 [2]
 For a thorough analysis and history of the constitutional position of such experiments in cooperative federalism, see Grad, Federal-State Compact: A New Experiment in Co-Operative Federalism, 63 Colum.L.Rev. 825 (1963) (discussing the federal role in the Delaware River Basin Commission)
 
 
 [3]
 The model conservation standards incorporated in the 1983 plan specify an energy performance budget for space heating. The energy performance budget does not require any particular building practice or components but instead mandates minimum overall energy efficiency and specifies several different approaches which builders can use to satisfy the performance standards. The energy budget is divided into three climatic regions depending upon the number of heating or cooling degree-days in the region
 
 
 [4]
 The Act treats conservation as an energy resource just as any other energy resource. Conservation is unusual, however, because it is not constructed by a utility with predictable costs and output. Determining the value of conservation as an energy resource is one of the complex theoretical problems which the plan confronts
 
 
 [1]
 The substantive effects of Council action are discussed below
 
 
 [2]
 Concurrent with and derived from this power of appointment, the Constitution "implicitly confers upon the President power to remove civil officers whom he appoints, at least those who exercise executive powers." Synar v. United States, 626 F.Supp. 1374, 1395 (D.D.C.1986) (declaring automatic deficit reduction provisions of the Balanced Budget and Emergency Deficit Control Act of 1985 unconstitutional as vesting executive power to prescribe federal budget reductions in the Comptroller General, an officer removable by Congress); see also Myers v. United States, 272 U.S. 52, 119, 47 S.Ct. 21, 26, 71 L.Ed. 160 (1926) (upholding as incident to power of appointment, the President's plenary power to dismiss a postmaster despite statutory requirement of advice and consent by the Senate)
 As with the appointment power, the authority to remove officers exercising executive authority serves the constitutional principle of separation of powers by preserving the President's control over executive governmental functions. It is thus significant that the members of the Council not only are not subject to appointment by the President, but also are not made subject to removal by him.
 
 
 [3]
 Indeed, the Framers expressly rejected the idea that the Appointments Clause is not violated so long as Congress does not arrogate to itself the power to appoint or remove federal officers. The Constitutional Convention voted down a proposed amendment to the Appointments Clause that would have permitted the Congress to delegate appointment power to state governors. 2 M. Farrand, The Records of the Federal Convention of 1787, 406, 418-19 (rev. ed. 1966)
 
 
 [4]
 The Council argues that the Buckley test is inapplicable because this case does not present a separation of powers issue. It is apparent, however, that this case raises a separation of powers issue to the extent that Congress and the states are usurping the President's power to nominate federal officers. This case also raises a separation of powers issue to the extent that a "state" entity is exercising authority over exclusively federal functions. In any event, the Council's argument lacks a basis in the text of the Appointments Clause